Good morning. Frank Sproul is appearing for the petitioners. As an a priori matter, I'd like to address the fact that this petition for review seems to have two separate cases. But I submit to you that we're really only here reviewing the original asylum claim. There was a motion to reopen in this matter. And after a great deal of torturous argument, the I.J. simply said, I can't draw a conclusion of fraud, so I'm going to give this no weight whatsoever. So despite the fact that a lot of trees gave their life for the motion to reopen, it doesn't detract or add from the original claim. And so I think we basically just have to address the original asylum claim, which I submit to you is basically what we call a mixed motive case. The government would claim it's a unimotive case. In the first round of hearings, the BIA found that there was no past persecution, and even if they did, it wasn't on a protected ground, correct? Right. They spent five pages after they found a lack of past persecution. They sort of acted as if there was, otherwise that would have ended the analysis, right? I mean, if there's no past persecution, the S.I.C. you know, the S.I.C. could have sent a letter saying, you know, we're targeting you for your political beliefs because of your family's multigenerational opposition to communism. Well, is there any evidence in the record before the I.J. that shows the S.I.C. targeted him based on political beliefs? Did he ever communicate his political beliefs to the S.I.C.? No. My point was if they found no past persecution, it wouldn't matter if there was blatant examples of that. And I think the analysis has to flow that the I.J. and the BIA assume that there was past persecution because they spent all their time talking about the motivations of the persecutors. But I'll address your question, Your Honor. It is – I will not insult the intelligence of this panel and say there was any explicit statements. It has to be done by extrapolation. You know, our argument is that the S.I.C. was a, frankly, political organization. The female petitioner was – their parents were noted anti-communists, you know, visible. They paid dearly for their beliefs. You know, there were some acts of defiance. They refused to – the female petitioner refused to put the S.I.C. sticker. And so, I mean, I think you have to look at it in the context of Bulgarian politics. And this – you know, this is a closed society, a small town. So, I mean, it's true. You have to look at the persecutors. They have to be trying to punish or suppress the victims. So it's true. There has to be the political component in terms of the victims. I submit to you by extrapolation, it's there. But what is that extrapolation? Because your argument seemed to go towards the past persecution rather than the fact that petitioners were targeted on the basis of political opinion. Well, I think the majority of my brief was about the past – about the politics of it. I mean, I think the husband was beaten. She was threatened with her life. They threatened to kidnap the child. I think that's past persecution. I mean, my argument was mostly based on the idea that by extrapolation, the actions of the S.I.C. were validly political. And because they are essentially an arm at the time of the former communists who were trying to regain control in Bulgaria. So they were trying to suppress the petitioners. Given the procedure by which we're here, it seems to me that since we have one decision already by the PAIA that says no past persecution, and even if they did, it's not on a protected ground, and we're here on motion to reopen, the only way you can really get to the motion to reopen is to suggest that there are changed circumstances, isn't it? Not exactly, Your Honor. Because, I mean, the motion to reopen was to suggest that the persecution continued. My worry was that I was trying to figure out what there was about what you said the second time that said changed circumstances. Well, our argument is they were specific facts. There were specific acts that were perpetrated against petitioners' family members. So we're suggesting — Were known before? Well, but the facts themselves were meant to buttress the fact that this persecution was still going on. We weren't saying that there was a sea change in Bulgarian political life. We were saying that it continued, and here's why, because the petitioners' family members were beaten. So it wasn't that we were saying that there was a massive change in the political landscape, but that it was continuing, and here was further evidence. So it was more of a buttressing as opposed to a changed circumstance. So the first time through, matter of TMB control, correct? If you — and that became matter of Borgia, but sure. I mean, to begin with, when the IJ and the BIA had it the first time, matter of TMB control, did it not? That was the legal landscape at the time, sure. And then we came along with Borgia. Correct. Borgia overruled matter of TMB. But in reading Borgia, did it really overrule its legal framework? I don't think it did, no. I mean, I think it still becomes a factual — I mean, you know, clearly there was a little bit of a tweak. Well, then the analysis isn't fatal to this Court affirming the BIA. No. But we — we claim that their legal conclusion, the way they construed the facts, is flawed. You know, I'm not — there's nothing wrong with Borgia itself. But we say that, you know, by extrapolation, the persecutors were attempting to punish and suppress the petitioners, and that's the Borgia test. At least in part, it has to be motivated politically and not the prosaic ends of a criminal organization. Well, then, when the BIA noted that the petitioners did — evidence did not show that they ever told the SIC that they were against the political views and refused to be a part of the organization, that's different than TMB, isn't it? Right. I mean, our position is that sometimes, you know, to ask petitioners to engage in heroic acts of self-sabotage is a bit much, that you don't always have to stand up and, you know, directly confront the persecutors. That's a high standard. So if it's unlike TMB, and TMB's legal framework is still valid, then I'm trying to figure out how I undo what the BIA did. Well, again, taken as given that TMB is the law, there's still a lot of stuff to, you know, combine that with the facts, right? TMB says if there's no politics at all, if it appears to be purely criminal, you lose. And we're saying that that's not what the facts suggest. So I grant you, at the time, TMB's law, but even taken as given that TMB's law, it didn't fit the facts. The facts here were more than just a criminal organization. So you're just saying substantial evidence does not sustain what the BIA did? Essentially, yes. I mean, it seems to me the facts, I can argue both sides of this, but there are facts sustaining what the BIA did, and then you've got your facts that say they weren't right. But I'm on a substantial evidence review, so I'm having a tough time. You're down to a little under three minutes. You want to save some time for rebuttal? I'll do that, yes, sir. Thank you very much for your argument. We'll hear from the Attorney General at this time. Good morning, Your Honors. May it please the Court, Senator Lee representing the Attorney General. Petitioner's counsel has tried to state that the SIC was basically related to the government somehow, Bulgaria, or a de facto type of government, but that's just not the case. The Board determined that the SIC is basically a criminal organization, and this enforcer for their organization because he was a strong, healthy male and because he was a former professional athlete who they thought would be willing to follow directions. And when Mr. ---- It's hard to tell in these former Soviet republics who's a crook and who's a politician, isn't it? Well, there is evidence of corruption by ---- I don't mean corrupt public officials. It's kind of hard to tell the difference between the controlling majority party and organized crime, isn't it? Your Honor, I think in this case, the evidence shows that the government was actually trying to stop corruption and make efforts to stop the mafia which is involved in this case. These criminal organizations basically were made up of former agents and former employees of the communist government, and these people ended up forming these extortion groups to perform extortion on regular persons. I think if I remember correctly, after the fall of the Soviet Union in 1989 or 90, whenever it was, that there were something like 17 former republics that made up the former USSR, and in 16 of the 17 after the fall, the former communist leadership was back in power running the organization. Was Bulgaria different? I think Bulgaria was one of those countries, but even so, the evidence in this case shows that groups like the SIC were not ---- they might have had some connection to politics because there were former communists who made up some of these groups, but it appears that their main goal was to extort money from regular people. How do you distinguish this case from the facts of the Dissier case? Because there, there was also an economic motive for the extortionate demands by an organization that has strong links to the government. So how do you think this case differs? This case is different because the Bulgarian government is not like the Haitian government in Dissier. In Dissier, the government under Duvalier was basically a kleptocracy, and as this court described it, it was a government by thievery. And so the Bulgarian government in this case is not the same as the Haitian government. Although there is some corruption, the government is actually trying to fight the corruption. It's not completely successful, and there is a lot of corruption, but the situation is very different than the Haitian government in Dissier. And so the the Is it correct that the SIC is composed in part of former KGB? The I think the there is some evidence in this case that there are former agents involved in these groups. KGB was the secret police arm in each of the former Soviet republics acting at the leadership, correct? Right, Your Honor. But there doesn't appear to be much evidence that the SIC is some sort of political group. You know, especially in this case in particular, the SIC tried to recruit Mr. Tronchev to be an enforcer. They never communicated any political goals to him, and they just wanted him to work for them because he was a strong male. And then when he refused, they got angry and they retaliated. And he felt that he had to flee the country. And after he left, the SIC found out that he was living in the United States and gave them money. And so there really is no evidence that they knew of any political opinion that he might have had. And he never stated that he would not join them because of any political opinion. In fact, there's really not much evidence that he has any sort of political opinion. And they never pointed to anything in the record saying that there's any indication that this group was motivated by his political opinion. Looking at the persecution, it seemed to me that documents were presented with regard to the evidence of her father's assassination. It seemed to me that those documents were, in fact, not treated very promisingly, I guess, is best I can say, by the IJ. And that the IJ wrongly required authentication under 8 CFR 287.6. Doesn't that suggest the IJ made a mistake? No, Your Honor. When the petitioners first submitted this medical document about her father, the IJ noted that, you know, he had some concerns about the document. And so at that point, that's when he asked them to get some sort of authentication. Right. And what they submitted was a document that did not even have the name of the hospital. I'm sorry, the original document did not have the name of the hospital. And then they submitted a document to authenticate the exam. The authentication turned out to be what the U.S. Embassy said was a forgery. And based on interviews with the notary public who supposedly notarized the certification, and she said the handwriting wasn't hers, her signature wasn't hers. And she was in a city that was 250 kilometers away from the hospital that supposedly was where the father went after he was beaten. And it was not incorrect of the IJ to ask the petitioners to submit more evidence to show that this document is reliable. Did the IJ really ask for submit more evidence, or did they require authentication? He did ask the petitioner to try to authenticate the document. And she tried to do it. Did he rely then on that failure to authenticate? Yes, Your Honor. Well, if he wrongly asked for that, isn't that a problem? He didn't wrongly ask for it, Your Honor. The case that the petitioners cite to support that argument does not even say what the petitioner says it says. That case is an adverse credibility case. And the Ninth Circuit in that case said that you can't rely solely on a failure to authenticate to make an adverse credibility determination unless there's evidence that undermines that document. And so it was proper for the IJ to ask for authentication in this case where there was indication. Did the IJ rely on the failure to authenticate, or did the IJ merely give more weight to the government's investigation than it did to the petitioner's testimony? I think it was some of both, Your Honor. There was a failure to authenticate, and also the medical examination was totally undermined by the investigation of the U.S. And on these two things, the IJ reasonably found that the medical exam was not reliable to show that, I guess, the petitioner's father was assassinated by communists, which actually is not that relevant to the underlying decision, because that was more about nexus, and they waived the past persecution binding. Okay. You're out of time. Thank you so much for your argument. Thanks for coming in today. Mr. Sprouls, you have a little under three minutes. Very briefly, Your Honors. The initial matter, I can assure the SIC was wrong based on my fee as to the petitioner's wealth, but that's a side issue. In terms of the clearly, the IJ said it had to be authenticated in terms of the motion we opened, and that was basically the reason. She was troubled by some of these problems stemming in a third-world country, but her conclusion was you didn't authenticate it, so I give it no weight. So I do think that that could be a grounds for a remand. One other brief point in terms of the SIC, in terms of, you know, the intermingling of criminality and politics, right, at that time. And one of the interesting things in this case was when the male petitioner was beaten and he called the police, when he told them it was the SIC, suddenly there was no more investigation. I mean, so they were ingrained in Bulgarian society. There was a fine book that I mentioned, Balkan Ghosts, that talked about that, that literally there was quite a bit of growing pains, that the communists had power, and they wielded it through former KGB people. So to – it's hard to separate out criminality and politics in Bulgarian society at that time, and that's where I think that, you know, this was a politically motivated act, and I would submit the petition should be granted. Roberts. Thank you. Thank you both for your arguments. The case just argued will be submitted for decision.
judges: Hawkins, Smith, Nguyen